Tharan Gregory Lanier (SBN 138784)
tglanier@JonesDay.com
Nathaniel P. Garrett (SBN 248211)
ngarrett@JonesDay.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone:     +1.415.626.3939
Facsimile:     +1.415.875.5700

Joshua L. Fuchs (*Pro Hac Vice*)
jlfuchs@jonesday.com
JONES DAY
717 Texas Street, Suite 3300
Houston, TX 77002
Telephone:     +1.832.239.3719
Facsimile:     +1.832.239.3600

J. Christopher Carraway (*Pro Hac Vice*)
chris.carraway@klarquist.com
Roy Chamcharas (*Pro Hac Vice*)
roy.chamcharas@klarquist.com
Klaus H. Hamm (State Bar No. 224905)
klaus.hamm@klarquist.com
John D. Vandenberg (*Pro Hac Vice*)
john.vandenberg@klarquist.com
KLARQUIST SPARKMAN, LLP
121 SW Salmon Street, Suite 1600
Portland, OR 97204
Telephone:     +1.503.595.5300
Facsimile:     +1.503.595.5301

*Attorneys for Defendants SAP SE, SAP
AMERICA, INC., and SAP LABS, LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| TERADATA US, INC., <br><br> Plaintiff, <br><br> v. <br><br> SAP SE, SAP AMERICA, INC., and SAP LABS, LLC, <br><br> Defendants. | Case No. 3:20-cv-06127-WHO <br><br> **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS AMENDED COMPLAINT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** <br><br> Date:   December 23, 2020 <br> Time:  2:00 p.m. <br> Judge:  Honorable William H. Orrick |

# TABLE OF CONTENTS

Page:

NOTICE OF MOTION AND MOTION TO DISMISS ...................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................1

I.       THE ASSERTED '000 PATENT CLAIMS ARE INVALID UNDER SECTION 101 .....1

         A.       The Asserted Claims Are Invalid Under
                  Section 101's Abstractness Exclusion To Patent Eligibility....................................6

                  1.       Step One: Each Asserted Claim is Directed to an Abstract Idea .................6

                  2.       Step Two: Each Asserted Claim Lacks a Saving Inventive Concept. .......12

         B.       The Claim's Invalidity Is Ripe For Adjudication Under Rule 12.........................18

II.      FAILURE TO ADEQUATELY PLEAD INDIRECT INFRINGEMENT.......................20

III.     CONCLUSION.............................................................................................................25

TABLE OF AUTHORITIES

Page(s):

**Cases**

*Affinity Labs of Texas, LLC v. DIRECTV, LLC*,
    838 F.3d 1253 (Fed. Cir. 2016)........................................................................ 15, 16

*Aftechmobile Inc. v. Salesforce.com, Inc.*,
    2020 WL 6129139 (N.D. Cal. Sept. 2, 2020)........................................................ 23

*Apple Computer, Inc. v. Microsoft Corp.*,
    799 F. Supp. 1006 (N.D. Cal. 1992) ...................................................................... 9

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................. 21, 23, 25

*Bilski v. Kappos*,
    561 U.S. 593 (2010) ........................................................................................ 18

*BSG Tech LLC v. BuySeasons, Inc.*,
    899 F.3d 1281 (Fed. Cir. 2018)......................................................................... 12

*buySAFE, Inc. v. Google, Inc.*,
    765 F.3d 1350 (Fed. Cir. 2014)......................................................................... 13

*Chamberlain Grp., Inc. v. Techtronic Indus. Co.*,
    935 F.3d 1341 (Fed. Cir. 2019)......................................................................... 13

*ChargePoint, Inc. v. SemaConnect, Inc.*,
    920 F.3d 759 (Fed. Cir. 2019)........................................................................... 19

*Cleveland Clinic Found. v. True Health Diagnostics LLC*,
    859 F.3d 1352 (Fed. Cir. 2017)......................................................................... 23

*DSU Med. Corp. v. JMS Co.*,
    471 F.3d 1293 (Fed. Cir. 2006)......................................................................... 24

*Dynamic Data Techs., LLC v. Brightcove Inc.*,
    2020 WL 4192613 (D. Del. July 21, 2020)........................................................... 24

*Elec. Power Grp., LLC v. Alstom, S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016)................................................................... passim

*Enfish, LLC v. Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016)................................................................ 8, 12, 16

*Evolutionary Intelligence, LLC v. Sprint Nextel Corp.*,
    137 F. Supp. 3d 1157 (N.D. Cal. 2015),
    *aff'd*, 677 F. App'x 679 (Fed. Cir. 2017) .......................................................... 18

*Global-Tech Appliances, Inc. v. SEB S.A.*,
    563 U.S. 754 (2011) ................................................................................................ 20

*Gottschalk v. Benson*,
    409 U.S. 63 (1972) .................................................................................................. 14

*Grobler v. Sony Comput. Entm't Am. LLC*,
    2013 WL 308937 (N.D. Cal. Jan. 25, 2013) ........................................................... 23

*Illumina, Inc. v. BGI Genomics Co.*,
    2020 WL 571030 (N.D. Cal. Feb. 5, 2020) .............................................................. 24

*In re Fox*,
    471 F.2d 1405 (C.C.P.A. 1973) ............................................................................... 17

*In re TLI Commc'ns LLC Patent Litig.*,
    823 F.3d 607 (Fed. Cir. 2016) ................................................................................. 14

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
    850 F.3d 1332 (Fed. Cir. 2017) ............................................................................... 13

*Intellectual Ventures I LLC v. Symantec Corp.*,
    838 F.3d 1307 (Fed. Cir. 2018) ................................................................................. 8

*Interval Licensing LLC v. AOL, Inc.*,
    896 F.3d 1335 (Fed. Cir. 2018) ................................................................................. 8

*Kaufman v. Microsoft Corp.*,
    2020 WL 364136 (S.D.N.Y. Jan. 22, 2020) ............................................................. 24

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
    566 U.S. 66 (2012) ................................................................................. 6, 7, 13, 14

*McRee v. Goldman*,
    2012 WL 3745190 (N.D. Cal. Aug. 28, 2012) ......................................................... 23

*Mortgage Grader, Inc. v. First Choice Loan Svcs. Inc.*,
    811 F.3d 1314 (Fed. Cir. 2016) ................................................................................. 6

*Parker v. Flook*,
    437 U.S. 584 (1978) ............................................................................................ 7, 13

*Proxyconn Inc. v. Microsoft Corp.*,
    2012 WL 1835680 (C.D. Cal. May 16, 2012) .......................................................... 25

*Purepredictive, Inc. v. H20.AI, Inc.*,
    2017 WL 3721480 (N.D. Cal. Aug. 29, 2017),
    *aff'd*, 741 F. App'x 802 (Fed. Cir. 2018) ................................................................. 8

*RecogniCorp, LLC v. Nintendo Co.*,
   855 F.3d 1322 (Fed. Cir. 2017) ........................................................................... 12

*SAP Am., Inc. v. InvestPic, LLC*,
   898 F.3d 1161 (Fed. Cir. 2018) .................................................................... passim

*Software Research, Inc. v. Dynatrace LLC*,
   316 F. Supp. 3d 1112 (N.D. Cal. July 3, 2018) .................................................. 22

*Software Rights Archive, LLC v. Facebook, Inc.*,
   2020 WL 5408089 (N.D. Cal. Sept. 9, 2020) ........................................... 7, 12, 16

*Superior Indus., LLC v. Thor Glob. Enterprises Ltd.*,
   700 F.3d 1287 (Fed. Cir. 2012) .................................................................... 20, 23

*Synopsys, Inc. v. Avatar Integrated Sys., Inc.*,
   2020 WL 6684853 (N.D. Cal. Nov. 12, 2020) ....................................... 7, 9, 12, 18

*Synopsys, Inc. v. Mentor Graphics Corp.*,
   839 F.3d 1138 (Fed. Cir. 2016) ............................................................................. 7

*Trading Techs. Int'l v. IBG LLC*,
   921 F.3d 1084 (Fed. Cir. 2019) .................................................................... passim

*Trading Techs. Int'l v. IBG LLC*,
   921 F.3d 1378 (Fed. Cir. 2019) ........................................................................... 12

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
   874 F.3d 1329 (Fed. Cir. 2017) ........................................................... 7, 12, 14

*Univ. of Fl. Research Found., Inc. v. General Elec. Co.*,
   916 F.3d 1363 (Fed. Cir. 2019) ....................................................................... 9, 19

*ZitoVault, LLC v. Int'l Bus. Machines Corp.*,
   2018 WL 2971131 (N.D. Tex. Mar. 29, 2018) .................................................... 22

**Statutes**

35 U.S.C. § 101 ................................................................................................... 1, 6, 18

35 U.S.C. § 271 ........................................................................................................... 20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE that on Wednesday, December 23, 2020, at 2:00 p.m., or as soon thereafter as the matter may be heard before the Honorable Judge William H. Orrick in the United States District Court for the Northern District of California, San Francisco Courthouse, Defendants SAP SE, SAP America, Inc., and SAP Labs, LLC ("SAP") by and through their counsel, will and hereby do move the Court to dismiss portions of the Amended Complaint (ECF No. 32) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

In response to SAP's motion to dismiss (ECF No. 27) the original complaint, Teradata filed its Amended Complaint asserting, among other things, additional patent claims of U.S. Pat. No. 7,185,000 (the "'000 patent"). This motion is made on the following grounds: (1) all asserted claims of the '000 patent are invalid for patent ineligibility under 35 U.S.C. § 101, and (2) the Amended Complaint fails to state a claim for indirect infringement of any patent. The motion is based on this Notice of Motion and Motion, the below Memorandum of Points and Authorities, the pleadings and papers filed herein, and the argument of counsel at the hearing.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     THE ASSERTED '000 PATENT CLAIMS ARE INVALID UNDER SECTION 101

A picture is worth …—there is no need to complete the sentence. For millennia humans have displayed information graphically to make it more easily understood. This basic precept of human communication is the central idea of the '000 patent asserted by Teradata.

The '000 patent (ECF No. 1-2) concerns presenting to a user a plan for answering a query to a database. The patent concedes that presenting query plans was old. Its purported contribution instead is to display graphically what conventionally had been displayed textually. ('000 patent at 9:34–39.) Its stated reason for doing this is what has always motivated humans to depict information graphically: to make it more easily understood. (*Id.* at 9:32–42.) This ancient and abstract idea is not patent eligible under governing precedents. *See Trading Techs. Int'l v. IBG LLC*, 921 F.3d 1084, 1093 (Fed. Cir. 2019) ("*Trading Techs. I*") (holding patent ineligible claims directed to "graphing [or displaying] bids and offers to assist a trader to make an order"); *Elec.*

*Power Grp., LLC v. Alstom, S.A.*, 830 F.3d 1350, 1352 (Fed. Cir. 2016) (holding patent ineligible a claim that recited displaying information in "visuals, tables, [or] charts").

Asserted claim 1 is invalid because it is directed to this [*graphical*][1] *display of selected information* and lacks any saving physical-realm inventive concept in application of this idea. The particular content of the information displayed by claim 1's method naturally differs from that displayed in the above precedents, but the law is settled that specifying particular content of information does not change its abstract nature as information. *Elec. Power Grp.*, 830 F.3d at 1353 ("[W]e have treated collecting information, including when limited to particular content (which does not change its character as information), as within the realm of abstract ideas.").

Newly asserted claims 19–25 add to this idea a mental step: basing the displayed query plan on data about a customer's environment. In these claims, the displayed query plan (the selected information) is based on data emulating an environment of a customer or other "target" system on which the query may be run: "an execution plan of a query based on emulation data that emulates an environment of a target system in which a parallel database system is implemented." ('000 patent at 14:40–43.) This data may be, for example, the number of processors in the customer's system. (*Id.* at 4:5–14, 5:5–7.) As most any consultant knows, it is best to consider the customer's environment when analyzing a plan to be performed by the customer.

'000 Patent Specification: The patent's title and its stated "technical field" is "methods and apparatus for presenting query plans." (*Id.* at 1:2–7.) The patent refers to these query plans also as "query execution plans." Per the patent's "Background," presenting query execution plans to users was conventional:

> One of the goals of a database management system is to optimize the performance of queries for access and manipulation of data stored in the database. This is accomplished by use of an optimizer program. Given a query, the optimizer program generates several alternative plans for accessing the requested data. …. Conventionally, database management systems provide a mechanism for a user to

---

[1] "Graphical" is bracketed because claim 1 is unclear whether it requires graphical display, which is immaterial here. *See infra* at 5.

1   view the execution plan for a given query. …. In some systems, the query execution

2   plan may be presented in text format.

3   (*Id*. at 1:13–28.)

4        The '000 patent identifies no problem with the hardware or software conventionally used

5   to present these query plans to users. Instead the problem is the complexity of the information

6   being displayed: "For complex execution plans, conventional explain text is often difficult to read

7   and understand." (*Id*. at 9:34–36.) The displayed execution plans are particularly complex when

8   the query will run in a "massively parallel processing" environment. (*Id*. at 1:29–39.) For this

9   information problem, the patent offers an information solution: ease user comprehension by

10  displaying the information graphically. "With the graphical output of the visual explain and

11  compare module, a more user-friendly interface is provided in which query execution plans may

12  be analyzed." (*Id*. at 9:36–39.) A picture is worth ….

13       The patent discloses icons interconnected with lines as an example of its graphical display:



24  This Fig. 6 example uses icons to represent each step of the displayed query plan and lines to depict

25  the steps' flow. (*Id*. at 3:51–53.) The patent's Figs. 7–16 and 18–19 likewise graphically depict a

26  query plan using interconnected icons. Figs. 15–16 add a textual description of the same query

27  plan alongside its graphical display while Figs. 18–19 graphically display multiple query plans for

28

easier comparison. The patent refers to its graphical display as a "visual plan," "graphical representation" and "graphical output" and refers to its textual display as a "text description" and "explain text." (*Id*. at 8:24–25, 8:50–51, 9:36.)

The '000 patent discusses what to display but not how. Specifically, it does not disclose any particular computer structures or acts used to display the plans graphically. Instead, the patent shows as a proverbial black box a "visual explain and compare" module (Fig. 1) and step (Fig. 3) responsible for creating the graphical displays shown in Figs. 6–16 and 18–19. (*See id*. at 3:45–53, 6:44–47, 7:42–46.) The patent summarizes the functions performed by this "visual explain and compare" module as follows—but not *how* it performs these functions:

> The visual explain and compare module of some embodiments of the invention provides for improved capabilities in analyzing performance of query execution plans. For complex execution plans, conventional explain text is often difficult to read and understand. With the graphical output of the visual explain and compare module, a more user-friendly interface is provided in which query execution plans may be analyzed. Further, plural execution plans of a query generated under different conditions may be displayed concurrently to enable a user to compare the execution plans for differences.

(*Id*. at 9:32–42.)

The '000 patent does not assert that displaying a query plan graphically improves a computer or display, or requires an improved computer or display. Rather, it indicates that no special device is needed to display the selected information graphically. Its methods may be performed by generic "control units" (*id*. at 12:3–8), and "[e]ach control unit may include a microprocessor, a microcontroller, a processor card (including one or more microprocessors or microcontrollers), or other control or computing devices. As used here, a 'controller' can refer to either hardware or software or a combination of both." (*Id*. at 12:15–19.)

Sometimes the plan displayed graphically for easier analysis is for a query to be run by a customer. In these circumstances, the displayed query plan is based on data describing the customer system on which the query is expected to run. (*See id*. at 4:5–14, 4:35–38, 5:5–7, 5:11–20, 5:24–29.) This data may be "any portion" of information about the environment of the customer system such as its number of nodes or CPUs per node. (*Id*. at 4:5–14.)

'000 Patent Claim 1: The Amended Complaint asserts specifically only claims 1 and 19–25. (Am. Compl., ¶¶ 47–60.) Claim 1 states (re-organized and reference labels added for clarity, and emphases added):

> 1. A method of *presenting* an execution plan for a query, comprising:
>
> > [a] determining steps of the query execution plan for a parallel database system;
> >
> > > [i] wherein determining the steps comprises determining steps of the query execution plan for the parallel database system running in a platform having plural virtual processors to handle access to data in the parallel database system[;]
> >
> > [b] *displaying* the steps of the query execution plan in a graphical user interface; and
> >
> > [c] depicting parallel execution of steps of the query execution plan in the graphical user interface,
> >
> > > [i] wherein depicting the parallel execution of steps comprises *displaying* plural elements corresponding to concurrently executing plural steps on respective processors of the parallel database system[.]

('000 patent at 12:58–13:7.)

This claim is unclear whether it requires that the information be displayed graphically. While the patent touts its alleged advance as the display of information graphically rather than only textually (*id*. at 9:34–39), claim 1 conspicuously omits "graphically" from both of its "displaying" steps. The claim's "graphical user interface" does not solve this mystery, as information may be displayed textually on a graphical user interface. (*See*, *e.g.*, *id*. at Fig. 15, box 580.) But this claim-scope ambiguity is immaterial to this motion, because graphical displays of information are no less abstract than textual displays of information. *See*, *e.g.*, *Trading Techs. I*, 921 F.3d at 1088 (patent ineligible claim recited "displaying an order icon").

Claims 4–9, 11, 13–18 and 27 are directed to the same idea. Dependent claims 4–9 and 11, and independent claim 27, add that two or three plans are displayed concurrently to allow their comparison. Dependent claims 13–15 add information details about the query plans being displayed, and dependent claims 16–18 add information details about the displayed information, such as displaying certain elements side-by-side.

'000 Patent Claim 19: Asserted claim 19 is directed to the same idea but adds that the displayed information is based on data about a target (e.g., customer) system environment:

> 19. A system comprising:
>
> a graphical user interface; and
>
> a controller to determine an execution plan of a query based on emulation data that emulates an environment of a target system in which a parallel database system is implemented, the controller to display a representation of the execution plan in the graphical user interface.

('000 patent at 14:39–44.)

Dependent claims 20–24 add details about the customer-related data. Claim 25 combines aspects of claims 1 and 19.

### A.    The Asserted Claims Are Invalid Under Section 101's Abstractness Exclusion To Patent Eligibility

The asserted claims of the '000 patent are directed to an abstract idea under *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014), and its forebears and progeny, with no saving inventive concept in application of the abstract idea, and thus, they are invalid under 35 U.S.C. § 101. While presumed valid by statute, they issued before *Alice* and thus were not examined under the patent-eligibility standard of *Alice*. Thousands of older patent claims have been invalidated under *Alice*. *See generally Mortgage Grader, Inc. v. First Choice Loan Svcs. Inc.*, 811 F.3d 1314, 1322 (Fed. Cir. 2016) (noting "a § 101 defense previously lacking in merit may be meritorious after *Alice*"). Application of the steps mandated by *Alice* demonstrates that these claims are invalid.

### 1.    Step One: Each Asserted Claim is Directed to an Abstract Idea

*Alice*'s first step is to determine whether a patent claim is "directed to" patent ineligible subject matter such as an abstract idea. *Alice*, 573 U.S. at 217. "Under this inquiry, we evaluate 'the focus of the claimed advance over the prior art' to determine if the character of the claim as a whole, considered in light of the specification, is directed to excluded subject matter." *Trading Techs. I*, 921 F.3d at 1092 (citation omitted).

Information is a patent ineligible abstract idea. *Id.* So are mental processes. *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012); *Parker v. Flook*, 437 U.S.

584, 586 (1978). And because selecting and analyzing information is what the human mind does, it too is a patent ineligible abstract idea when not tied to a specific structure or machine:

> Information as such is an intangible. Accordingly, we have treated collecting information, including when limited to particular content (which does not change its character as information), as within the realm of abstract ideas. In a similar vein, we have treated analyzing information by steps people go through in their minds, or by mathematical algorithms, without more, as essentially mental processes within the abstract-idea category.

*Elec. Power Grp,* 830 F.3d at 1353–54 (citation omitted); *see SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1168 (Fed. Cir. 2018) (holding patent ineligible claims focused on "an improvement in wholly abstract ideas—the selection and mathematical analysis of information, followed by reporting or display of the results"); *Software Rights Archive, LLC v. Facebook, Inc.*, No. 12-cv-03970-HSG, 2020 WL 5408089, *5 (N.D. Cal. Sept. 9, 2020) (granting judgment on pleadings based on patent ineligibility, holding that "the claims are directed to an abstract idea, namely the collection, analysis, and display of certain information"), *appeal filed*, 2020 WL 5408089 (Fed. Cir. Oct. 15, 2020).

Likewise abstract are mere functions and results unlimited by particular structures or acts for how to perform or achieve them. *See Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017) (holding patent ineligible a claim that "requires the functional results of 'converting,' 'routing,' 'controlling,' 'monitoring,' and 'accumulating records,' but does not sufficiently describe how to achieve these results in a non-abstract way").

Abstract ideas are patent ineligible even if "novel and useful," *Flook*, 437 U.S. at 588, 591, and "narrow and specific," *Mayo*, 566 U.S. at 88. *See SAP Am.*, 898 F.3d at 1163 ("We may assume that the techniques claimed are '[g]roundbreaking, innovative, or even brilliant,' but that is not enough for eligibility." (citation omitted)); *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151 (Fed. Cir. 2016) ("[A] claim for a new abstract idea is still an abstract idea."); *Synopsys, Inc. v. Avatar Integrated Sys., Inc.*, No. 20-cv-04151-WHO, 2020 WL 6684853, at *7 (N.D. Cal. Nov. 12, 2020) (hereinafter, "*Avatar*") ("The Federal Circuit has repeatedly found useful and innovative ideas ineligible for patenting where they are directed to abstract concepts.").

1    A patent claim may *recite* an abstract idea without being "directed to" it. For example, such
2    a claim may instead be directed to a patent-eligible improvement in how computers operate.
3    *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016). But the claim is directed to
4    the abstract idea if it recites merely using a computer as a tool to perform the idea, without
5    improving how the computer operates. *See id.* at 1336; *Intellectual Ventures I LLC v. Symantec*
6    *Corp.*, 838 F.3d 1307, 1321 (Fed. Cir. 2018) (distinguishing the claim at issue from those found
7    eligible in *Enfish* because it did "not improve or change the way a computer functions"); *Elec.*
8    *Power Grp.*, 830 F.3d at 1354 (explaining the *Enfish* claims "focused not on asserted advances in
9    uses to which existing computer capabilities could be put, but on a specific improvement—a
10   particular database technique—in how computers could carry out one of their basic functions of
11   storage and retrieval of data"); *Purepredictive, Inc. v. H20.AI, Inc.*, No. 17-CV-03049-WHO, 2017
12   WL 3721480, at *5 (N.D. Cal. Aug. 29, 2017) ("While [the claims] may invoke computers as a
13   tool for this process, the claims do not make a specific improvement on an existing computer-
14   related technology."), *aff'd*, 741 F. App'x 802 (Fed. Cir. 2018).

15   Claim 1 of the '000 patent is directed to the idea of the [*graphical*] *display of selected*
16   *information*. The starting point is the claim's preamble, which recites a "method of presenting"
17   certain information. This is consistent with the patent's title and "technical field," each of which
18   states: "method and apparatus for presenting query plans." ('000 patent at 1:1–7.) This also is
19   consistent with the body of the claim which recites "displaying" and "depicting" selected
20   information. (*Id*. at 12:62–65.) Specifically, the claim's second step is "displaying" selected
21   information and its third step is "depicting" selected information "wherein depicting [the
22   information] comprises displaying" information. (*Id*. at 12:62–67.) These "displaying" and
23   "depicting" claim steps recite that the information is displayed "in a graphical user interface" but
24   do not specify how this is done or any details of this interface. The claim recites no particular
25   structures or acts that perform these display and depict functions. Instead, putting aside the specific
26   information content selected for display, they are nothing more than "conventional functions stated
27   in general terms." *Cf. Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1338 (Fed. Cir. 2018)
28   ("The claim limitations for accessing, scheduling, and then displaying the second information set

are conventional functions stated in general terms and do not further define how the attention manager segregates the display of two sets of data on a display screen."); *Avatar*, 2020 WL 6684853, at *6 (noting in its *Alice* Step One analysis that "the claim does not explain or lay out a specific way or inventive technology for performing" the claim's abstract steps).

The patent applicants do not purport in the patent to have invented or improved the "graphical user interface" ("GUI") recited in the claim. Indeed, graphical user interfaces on computers date back to the 1970s. *See generally Apple Computer, Inc. v. Microsoft Corp.*, 799 F. Supp. 1006, 1017–20 (N.D. Cal. 1992) (discussing history of graphical user interfaces at Xerox (beginning in the 1970s) and Apple and Microsoft (beginning in the 1980s)). *Cf. Trading Techs. I*, 921 F.3d at 1093 ("The specification indicates the claimed GUI is displayed on any computing device. …. As a general rule, 'the collection, organization, and display of two sets of information on a generic display device is abstract.'" (citation omitted)); *Univ. of Fl. Research Found., Inc. v. General Elec. Co.*, 916 F.3d 1363, 1366, 1368 (Fed. Cir. 2019) (holding patent ineligible claims reciting a "graphical user interface" as being directed to "collecting, analyzing, manipulating, and displaying data"). Claim 1 does not recite any element of its graphical user interface nor any particular structures or acts used to generate it.

The only other step of claim 1 is "determining" some of the information to be displayed, namely steps of the query plan. Of course, whenever information is displayed, it first must be determined. The claim does not recite how this information is determined. Instead, the claim again generically recites a conventional function to be performed without specifying how it is performed. The patent concedes that determining a query plan is conventional. ('000 patent at 1:13–18, 1:29–39 (noting database management systems use optimizer programs to generate plans, sometimes for queries to be run in a "massively parallel processing" system).)

In determining the focus of a claim, the specification also is considered. As noted, the patent here identifies its purported advance as being the graphical display of information that conventionally was displayed textually. *See supra* at 2–3.

Therefore, based on the claim language and the specification, claim 1 is directed to the [*graphical*] *display of selected information*.

Claims 4–9, 11, 13–18 and 27 are directed to the same idea. They simply add some more abstract, information-based details, such as concurrently displaying multiple query plans, or details about the queries or information being displayed.

Asserted claims 19–25 are directed to the [*graphical*] *display of selected information* (*based on data about a customer's environment*). Claim 19 recites two limitations: a "graphical user interface" and a "controller" to "display a representation" of a query plan determined by the controller. Unlike claim 1, claim 19 specifies that the displayed plan is based on data emulating an environment of a target (e.g., customer) system. As noted, this is done when the query plan being displayed for easier understanding is expected to be run on the customer system. Dependent claims 20–24 add details about the customer-related data. Claim 25 recites an "article" combining aspects of claims 1 and 19. None of claims 19–25 specifies *how* the customer-related data is generated or gathered. They recite no particular acts or structures for gathering this data.

This idea—the [*graphical*] *display of selected information* or the [*graphical*] *display of selected information* (*based on data about a customer's environment*)—is a patent ineligible abstract idea under governing precedents, including the following two close precedents.

<u>*Trading Techs. I*</u>: Two of the asserted patents disclosed "a user interface for an electronic trading system that allows a remote trader to view trends in the orders for an item, and provides the trading information in an *easy to see and interpret graphical format*" which "allows a trader to process information more quickly." 921 F.3d at 1087, 1089 (emphasis added). The claims recited several graphical display elements including icons and scaled axes along which various indicators were placed. *Id*. at 1088–89. They also recited receiving particular information from a particular source: "an electronic exchange." *Id*. at 1088. Without questioning that graphically displaying the information makes it easier to understand, the Court affirmed that the claims were patent ineligible and directed to the abstract idea of "graphing (or displaying) bids and offers to assist a trader to make an order." *Id*. at 1092–93. "This invention makes the *trader* faster and more efficient, not the computer." *Id*. at 1090 (emphasis in original). Similarly, here the claimed [*graphical*] *display of selected information* helps the user understand the query plan, but does not even arguably improve a computer or a display device.

1    *Electric Power Group*: The patents' alleged advance was to collect and analyze in real time

2    a mass of particular information from a particular source (a power grid) and present to a user, in a

3    visual display, indications of the operating state and health of the power system. *See* 830 F.3d at

4    1355. The claimed displays included graphical displays such as "visuals, tables, charts" and

5    "concurrent visualization" of different information. *Id*. at 1352. The Court did not question that

6    the claimed method provided a "'humanly comprehensible' amount of information useful for

7    users." *Id*. at 1355. Yet, despite this utility, the claims were invalid under *Alice*, being directed to

8    the abstract idea of "collecting information, analyzing it, and displaying certain results of the

9    collection and analysis." *Id*. at 1353. "[M]erely selecting information, by content or source, for

10   collection, analysis, and display does nothing significant to differentiate a process from ordinary

11   mental processes, whose implicit exclusion from § 101 undergirds the information-based category

12   of abstract ideas." *Id*. at 1355. Here too, the claimed method merely selects information by content

13   for [graphical] display.

14       In each of *Trading Techs. I* and *Electric Power Group*, the alleged innovation displayed

15   information graphically to make it easier for the user to understand, and depended on receiving

16   particular data from a particular source. And in each, the Federal Circuit declared the claims patent

17   ineligible under *Alice*. Those precedents are *stare decisis* here because the alleged innovation is

18   essentially the same idea—the [*graphical*] *display of selected information* or the [*graphical*]

19   *display of selected information* (*based on data about a customer's environment*)—for the same

20   purpose—to make the information easier for a person to understand. *See SAP Am.*, 898 F.3d at

21   1168 (holding ineligible claims focused on "an improvement in wholly abstract ideas—the

22   selection and mathematical analysis of information, followed by reporting or display of the

23   results"). Further, when a plan is to be executed by a customer, it is a patent-ineligible mental step

24   to base that plan on data about the customer's environment.

25       Post-*Alice*, patent owners trying to defend information-based claims such as these have

26   attempted to conflate patent ineligible useful ideas implemented on a computer, with patent-

27   eligible improvements to the computer itself. The Federal Circuit and this Court have rejected

28   these attempts. *See*, *e.g.*, *RecogniCorp, LLC v. Nintendo Co.,* 855 F.3d 1322, 1324, 1327 (Fed. Cir.

2017) (holding that a computer-implemented process for creating images that started with data, added an algorithm, and ended with new data was directed to an abstract idea and did not improve the functioning of a computer, even though it allegedly required less memory and bandwidth than prior art processes); *Software Rights*, 2020 WL 5408089, at *5 ("The patents do not detail any efficiency benefits to the computer itself—such as improved memory availability or operating speed—but only point to improving the search results displayed generically to the user."). These patent owners tout the *inherent benefits of better information* as if they arise from an improvement to the computer itself as a tool. But better or more easily understood information does not make a better display tool—be it a piece of paper, a whiteboard, a television screen or a computer monitor. *See Trading Techs. Int'l v. IBG LLC*, 921 F.3d 1378, 1384 (Fed. Cir. 2019) ("*Trading Techs. II*") ("The claims are focused on providing information to traders in a way that helps them process information more quickly . . . not on improving computers or technology." (citation omitted)). *Cf. BSG Tech LLC v. BuySeasons, Inc.*, 899 F.3d 1281, 1288 (Fed. Cir. 2018) ("[A]n improvement to the information stored by a database is not equivalent to an improvement in the database's functionality."). Here, as noted *supra* at 4, the '000 patent's "specification makes clear that off-the-shelf computer technology is usable to carry out the analysis." *SAP Am.,* 898 F.3d at 1168. The alleged benefits flow from displaying information graphically for easier analysis and from considering the customer's environment when determining a plan for a customer, neither of which even arguably improves the basic functions of a computer or a display. *Cf. Avatar*, 2020 WL 6684853, at *7 ("To the extent this reflects an improvement in the process of chip design, the improvement flows entirely from an improvement in the quality of the data used to create the abstraction, not from any improvement to the functioning of a computer as in *Enfish*.").

In sum, each asserted claim of the '000 patent is directed to the [*graphical*] *display of selected information* or the [*graphical*] *display of selected information* (*based on data about a customer's environment*), which is a patent ineligible abstract idea.

## 2.   Step Two: Each Asserted Claim Lacks a Saving Inventive Concept

A claim directed to an abstract idea may nevertheless be patent eligible if it also recites a "saving inventive concept" in application of the idea, *Two-Way Media*, 874 F.3d at 1338, that adds

"significantly more" to the idea, *Alice*, 573 U.S. at 217–18, 221–22. This requires an "innovation in the non-abstract application realm," *SAP Am.*, 898 F.3d at 1163, i.e., "a 'new and useful application' of the ineligible matter in the physical realm," *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1353 (Fed. Cir. 2014). Thus, before determining whether claim elements provide an "'inventive concept' in application" of the abstract idea, a court first must identify those claim elements that are not abstract. *SAP Am.*, 898 F.3d at 1168–70 (disregarding under Step Two certain claimed operations because they "simply provide further narrowing of what are still mathematical operations . . . [and] add nothing outside the abstract realm" (citation omitted)).

In particular, *Alice* Step Two addresses the "additional elements" the claim appends to the abstract idea, not the abstract idea itself. The Supreme Court made this distinction repeatedly in *Mayo* and *Alice*, referring to "additional elements," "additional features," "other elements," "additional steps," "other steps," steps "apart from" the abstract idea (or natural law), and asking "what else is there?" *Alice*, 573 U.S. at 217, 221, 223; *Mayo*, 566 U.S. at 72–73, 77–81, 90; *see Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1349 (Fed. Cir. 2019) ("Wireless communication cannot be an inventive concept here, because it is the abstract idea that the claims are directed to.").

Additional physical-realm elements that merely limit the claim's idea "to a particular technological environment" are insufficient. *Alice*, 573 U.S. at 223. So are conventional post-solution activities such as using the solution of an algorithm in some conventional activity. *Flook*, 437 U.S. at 590 ("The notion that post-solution activity, no matter how conventional or obvious in itself, can transform an unpatentable principle into a patentable process exalts form over substance. . . . [T]he Pythagorean theorem would not have been patentable, or partially patentable, because a patent application contained a final step indicating that the formula, when solved, could be usefully applied to existing surveying techniques."). So too are steps merely gathering or generating the information to which the abstract idea is applied. *See Mayo*, 566 U.S. at 79.

Also inadequate under Step Two are purely functional claim elements, which recite a result or function without a particular way for how to achieve or perform it. *See Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1342 (Fed. Cir. 2017) ("[T]he claim language here

provides only a result-oriented solution, with insufficient detail for how a computer accomplishes it. Our law demands more."); *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 613, 615 (Fed. Cir. 2016) (noting that particularly in view of the specification's "abstract functional descriptions" of these tangible components, "the recited physical components behave exactly as expected according to their ordinary use," and thus "recitation of a 'telephone unit,' a 'server,' an 'image analysis unit,' and a 'control unit' fail to add an inventive concept").

Routine, generic, well-known or conventional elements or combinations of elements cannot save a claim under Step Two. *Alice*, 573 U.S. at 225 (holding claim steps requiring "use of a computer to obtain data, adjust account balances, and issue automated instructions" do "no more than require a generic computer to perform generic computer functions"); *SAP Am.*, 898 F.3d at 1170 (rejecting an argument that the inclusion of a "parallel processing" computing architecture in a claim rendered it patent eligible, where, "[t]o the extent that parallel processing is discussed in the specification, it is characterized as generic parallel processing components—not even asserted to be an invention of [the patentee]—on which the claimed method could run"). Instead, to be a "saving inventive concept" in application, *Two-Way Media*, 874 F.3d at 1338, the claim's physical-realm application of the abstract idea must be novel. As explained in *Alice*, the Supreme Court required this in *Gottschalk v. Benson*, 409 U.S. 63 (1972): "[b]ecause the algorithm was an abstract idea . . . the claim had to supply a 'new and useful' application of the idea in order to be patent eligible." *Alice*, 573 U.S. at 222 (quoting *Benson*, 409 U.S. at 67); *accord SAP Am.*, 898 F.3d at 1170 ("[A]n invocation of already-available computers that are not themselves plausibly asserted to be an advance, for use in carrying out improved mathematical calculations, amounts to a recitation of what is 'well-understood, routine, [and] conventional.'" (quoting *Mayo*, 566 U.S. at 73)).

Here, no asserted claim has a saving physical-realm inventive concept in application of its abstract idea. Nearly all of each claim is in the abstract realm, being either *information* ("an execution plan [for / of] a query," "steps of the [query] execution plan," "plural elements," "data in the parallel database system," "emulation data that emulates an environment of a target system," "a representation of the execution plan," "environment information") or *information processing*

("[determining / determine]" information, "[displaying / display]" information, "[depicting / depict]" information, "receive" information "to emulate a target database system"). These information-processing steps also are purely functional, without specifying any particular structure or physical acts taken to implement the step. For example, no asserted claim specifies *how* to determine a query plan or *how* to gather data to emulate an environment of a customer system. This further disqualifies them from consideration under *Alice* Step Two. *See supra* at 13–14.

A close precedent is *Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1263 (Fed. Cir. 2016) which disregarded an element that was "nothing but a functionally described display of information." This functional claim element in *Affinity Labs* is quoted below:

> an application configured for execution by the wireless cellular telephone device that when executed, enables the wireless cellular telephone device: to present a graphical user interface comprising at least a partial listing of available media sources on a display associated with the wireless cellular telephone device, wherein the listing includes a selectable item that enables user selection of the regional broadcasting channel

*Id*. at 1255–56. The court's reason for disregarding this functional claim element under *Alice* Step Two applies with equal force to the asserted claims' display and depict claim elements:

> The essential advance is not in the process of downloading applications, but only in the content of this particular application, and that is nothing but a functionally described display of information. That description does not cross out of the abstract idea category. *Elec. Power Grp.,* op. at 1352. *There is no further specification of a particular technology for getting the defined content displayed*. Thus, the user-downloadable application does not constitute an inventive concept sufficient to render the claims patent-eligible.

*Id*. at 1263 (emphasis added).

Like the above-quoted claim element in *Affinity Labs*, each of claims 1 and 19–25 of the '000 patent restricts the particular *content* of the information selected for display. For example, the "plural elements" displayed in claim 1 "correspond[] to concurrently executing plural steps on respective processors of the parallel database system" and the "steps" displayed are "steps of the query execution plan for the parallel database system running in a platform having plural virtual processors to handle access to data in the parallel database system." ('000 patent at 12:66–13:7.) But limiting information "to particular content" "does not change its character as information."

*Elec. Power Grp.*, 830 F.3d at 1353; *Software Rights*, 2020 WL 5408089, at *10 ("even though some of the information collected and analyzed may have been different from that used in text-based searching, such narrowing cannot amount to 'significantly more' than the overall ineligible concept of information collection and analysis to which the claims are directed"). Similarly, claims 19–25 restrict the particular content and source of some of the data—namely that the data emulates a target (e.g., customer) system—but "selecting information, by content or source" does not remove its "collection, analysis, and display" from "the information-based category of abstract ideas." *Elec. Power Grp.*, 830 F.3d at 1355.

As noted, each asserted claim also recites determining the query plan, but this fails Step Two because it (1) is in the abstract realm, (2) is purely functional—indicating merely that the information is determined in some unspecified and possibly conventional manner—and (3) merely gathers the information to be displayed and thus constitutes an insufficient "data gathering" step. *See supra* at 11–12. Claim 25's "receive environment information" limitation likewise is mere data gathering.

The asserted claims recite nothing akin to the claimed improved data structure in *Enfish*. *See Enfish*, 822 F.3d at 1339 (holding patent eligible an allegedly innovative self-referential data structure that improved the way a computer stores and retrieves data in memory). Claim 1 recites that the technological environment of its "method of presenting" includes "a parallel database system" having "processors," "a platform having plural virtual processors," and "a graphical user interface." ('000 patent at 12:58–13:7.) Claims 19–25 recite some of these same parts of the technological environment. (*Id*. at 14:40–15:10.) But each of these is a generic recitation of a conventional computer component, not a purported innovation. *Cf. Affinity Labs*, 838 F.3d at 1262 (holding that "generic features of cellular telephones, such as … a graphical user interface" do not qualify as an inventive concept). Unlike *Enfish*, the patent here does not purport to have contributed or improved any database system, processor, virtual processor, graphical user interface or other computer component. Instead, the patent's descriptions of these parts of the environment assume that the skilled artisan is already familiar with them:

For example, in many data warehousing systems, the platforms used to run the database management software are multi-node parallel processing systems having tens or even hundreds of nodes (sometimes referred to as massively parallel processing or MPP systems).

\*\*\*

In addition, as illustrated in FIG. 2, each node 100 (or AMP) includes multiple virtual processors (VPROCs) 104 to more efficiently handle access requests to storage devices 106.

('000 patent at 1:31–35, 5:53–56.) *See SAP Am.*, 898 F.3d at 1170 (rejecting an argument that reciting a "parallel processing" computing architecture rendered a claim patent eligible, where, "[t]o the extent that parallel processing is discussed in the specification, it is characterized as generic parallel processing components—not even asserted to be an invention of [the patentee]—on which the claimed method could run"); *In re Fox*, 471 F.2d 1405, 1407 (C.C.P.A. 1973) (claim elements that are not described in detail in the patent specification are presumed to be known to those of ordinary skill in the art).

Claim 25 recites a "controller," but the specification indicates that this too is a generic element: "As used here, a 'controller' can refer to either hardware or software or a combination of both." ('000 patent at 12:15–19.)

The Amended Complaint confirms what the patent indicates: the claims' technological environment was nothing new. It asserts that Teradata's database systems have used "massively" parallel processing since the early 1980s and that in 1994 Teradata obtained a patent on a "virtual processor" system. (Am. Compl., ¶¶ 13–16.) It also indicates that it was known to optimize queries that would run in a parallel database. (*Id.*, ¶¶ 40–41, 48.)

In sum, the only non-abstract realm language in the asserted claims describes merely a conventional technological environment. Thus, the Step Two assessments in *Trading Techs. I* and *Electric Power Group,* apply equally here:

TT argues the claims improve computer functionality by improving on the intuitiveness and efficiency of prior GUI tools. The specification makes clear that this invention helps the trader process information more quickly. This is not an improvement to computer functionality, as alleged by TT. *Trading Techs. I*, 921 F.3d at 1094.

The claims at issue do not require any nonconventional computer, network, or display components, or even a "non-conventional and non-generic arrangement of known, conventional pieces," but merely call for performance of the claimed information collection, analysis, and display functions "on a set of generic computer components" and display devices. *Elec. Power Grp.*, 830 F.3d at 1355.

Finally, an "important clue" to patent eligibility is whether the claim recites a particular machine or particular transformation of a particular article. *Bilski v. Kappos*, 561 U.S. 593, 604 (2010). That clue here further supports granting this motion because no asserted claim requires a particular machine or particular transformation of any particular article. *See Evolutionary Intelligence, LLC v. Sprint Nextel Corp.*, 137 F. Supp. 3d 1157, 1169 (N.D. Cal. 2015) (holding that claims reciting a generic computer failed this machine-or-transformation test), *aff'd*, 677 F. App'x 679 (Fed. Cir. 2017). No asserted claim identifies a particular display device or particular computer performing the claimed steps or functions.

The patent's remaining claims fail *Alice* Step Two for all the same reasons. They add no arguably physical-realm innovation, instead adding merely details about the query plans or information being displayed. Therefore, nothing added by these claims qualifies as a candidate for a physical-realm "saving inventive concept" under Step Two.

In sum, the asserted claims of the '000 patent are invalid for being directed to an abstract idea without any saving inventive concept in application.

## B.     The Claim's Invalidity Is Ripe For Adjudication Under Rule 12

"The Federal Circuit has 'repeatedly recognized that in many cases it is possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion' [and] where it is possible and proper, 'claim construction is not an inviolable prerequisite to a validity determination under § 101.'" *Avatar*, 2020 WL 6684853, at *4 (citations omitted). Implementing an abstract idea on a "generic computer to perform generic computer functions" is patent ineligible. *Alice*, 573 U.S. at 225. Applying this principle to the asserted claims of the '000 patent requires no fact finding. The patent and Amended Complaint show that the claims' physical-realm environment is old. Nor is claim construction needed because even a narrow abstract idea is ineligible. Thus, the '000 patent infringement count should be dismissed under Rule 12. *See*, *e.g.*, *ChargePoint, Inc. v.*

*SemaConnect, Inc.*, 920 F.3d 759, 773–75 (Fed. Cir. 2019) (affirming dismissal under Rule 12(b)(6) where the claims' only possible innovation was the abstract idea itself); *Univ. of Fl. Research Found.*, 916 F.3d at 1368 (affirming Rule 12(b)(6) dismissal of complaint asserting claims directed to "collecting, analyzing, manipulating, and displaying data").

The allegations Teradata added to its Amended Complaint, in response to SAP's motion to dismiss (ECF No. 27) the original complaint, do not save these claims under either Step One or Step Two of the *Alice* analysis. Step One presents a question of law based on the four corners of the patent, not any allegations of fact in the Amended Complaint. While a complaint's fact allegations in some circumstances can create a Step Two material fact dispute precluding Rule 12 dismissal, that is not the case here. Instead, following the well-trodden path of many unsuccessful post-*Alice* patent plaintiffs before it, Teradata has merely loaded the Amended Complaint with irrelevant praise of the alleged *utility* and *novelty* of the claims' abstract idea.

Utility: The Amended Complaint alleges that the claimed display of query plans allows database administrators to "better analyze" those plans and to analyze them "efficiently." (Am. Compl., ¶¶ 41, 48; *see also id*., ¶¶ 42, 52.) And, it alleges, basing a customer's query plan on the customer system's environment, such as its number of CPUs, allows one to analyze problems with the query when run on a customer's system. (*Id*., ¶¶ 42, 48–49.) Accepting these allegations of utility as true for purposes of this motion, they are irrelevant because they describe benefits inherent in the information-based abstract ideas themselves, not arising from some particular physical-realm application of the idea. Graphically displaying complex information inherently allows one to better analyze it. When that displayed information relates to a particular customer, basing it on data describing that customer's environment inherently makes the displayed information more useful. This inherent information-based utility does not depend on some particular device or structure. Thus, these paragraphs of the Amended Complaint do no more than tout the usefulness of the abstract idea, which is irrelevant as a matter of law. *See supra* at 7.

Novelty: The Amended Complaint alleges also that these useful ideas were "innovative." (*Id*., ¶¶ 48, 50, 52–53.) But its allegations of novelty again address the abstract ideas themselves,

and the use of these ideas in a particular technological environment of parallel databases. (*Id*.) As explained *supra* at 7, this too is irrelevant as a matter of law.

Finally, what Teradata does *not* allege in its Amended Complaint is significant. It does not allege that the claimed subject matter improves the basic operations of any computer, display or component thereof. On the contrary, the alleged invention allegedly makes the database administrator better not the computer system. *Cf. Trading Techs. I*, 921 F.3d at 1090 ("This invention makes the *trader* faster and more efficient, not the computer." (emphasis in original)).

## II.   FAILURE TO ADEQUATELY PLEAD INDIRECT INFRINGEMENT

Inducement infringement under 35 U.S.C. § 271(b) and contributory infringement under § 271(c) collectively are known as "indirect infringement." Unlike "direct infringement," each requires knowledge that the accused actions infringe the patent. *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 763, 765–66 (2011). Thus, "a violator of § 271(c) must know 'that the combination for which his component was especially designed was both patented and infringing,'" *id*. at 763 (citation omitted), and "induced infringement under § 271(b) requires knowledge that the induced acts constitute patent infringement," *id*. at 766. Also, there is no inducement infringement unless the defendant "specifically intended to induce infringement." *Superior Indus., LLC v. Thor Glob. Enterprises Ltd*., 700 F.3d 1287, 1296 (Fed. Cir. 2012).

Teradata's Amended Complaint lacks facial plausibility as to both this knowledge element of indirect infringement and also this "specific intent" element of inducement infringement for all five asserted patents. For two patents (the '419 and '623 patents) it does not assert that any SAP defendant even knew of the patent prior to transmittal of the Complaint. (Am. Compl., ¶¶ 63, 67, 91, 95.) It is not reasonable to infer that a business knows it is infringing and intends to infringe a patent it has never seen. For two other patents (the '357 and '000 patents) the Amended Complaint's thin allegations of possible pre-suit knowledge of the patent likewise fail to make knowledge of infringement or "specific intent" facially plausible. (*See id*., ¶¶ 24, 28, 58, 59.) For the '923 patent, the Amended Complaint adequately pleads knowledge of the patent as of August 2019 but nothing to make "specific intent" facially plausible. (*See id*., ¶¶ 77, 81.)

1    "A claim has facial plausibility when the plaintiff pleads factual content that allows the

2    court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

3    *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are merely

4    consistent with a defendant's liability, it stops short of the line between possibility and plausibility

5    of entitlement to relief." *Id.* (internal quotation marks and citation omitted). "[A] court considering

6    a motion to dismiss can choose to begin by identifying pleadings that, because they are no more

7    than conclusions, are not entitled to the assumption of truth." *Id.* at 679. For example, in *Iqbal*, the

8    following allegations were "conclusory and not entitled to be assumed true": "that petitioners

9    agreed to subject [plaintiff] to harsh conditions as a matter of policy, solely on account of

10   discriminatory factors and for no legitimate penological interest; that Ashcroft was that policy's

11   'principal architect'; and that Mueller was 'instrumental' in its adoption and execution." *Id.* at 662.

12       Teradata alleges that it has obtained "more than 1000 patents." (Am. Compl., ¶ 17.) Those

13   Teradata patents cite as prior art perhaps several thousand third-party patents. That fact, of course,

14   does not make it plausible that any infringement of any of those third-party patents by a Teradata

15   product was knowingly caused and specifically intended by Teradata. Indeed, that fact does not

16   make it plausible that Teradata even looked at those thousands of cited patents to determine

17   whether they are infringed. Yet Teradata relies upon isolated citations of two of its asserted patents

18   (and an application for a third) during prosecution of patent applications of SAP SE, or a SAP

19   subsidiary or predecessor-in-interest, as a supposed basis for inferring knowledge and intent to

20   infringe. (*See id.*, ¶¶ 24, 58, 77.) Specifically, the Amended Complaint alleges that: (1) "In July

21   2011, the '357 Patent was cited to SAP's subsidiary, Business Objects . . . during the prosecution

22   of" a patent application of that subsidiary; (2) "In July 2012, SAP acquired ownership of [a patent]

23   from IBM" listing the '000 patent as prior art; and (3) "On August 23, 2018, the patent application

24   that led to the issuance of the '923 Patent was cited to SAP SE . . . during the prosecution of" a

25   SAP SE patent. (*See id.*) Teradata adds other allegations not specific to the asserted patents:

26       Teradata will seek to determine in discovery whether SAP became aware of the
         '923 Patent after its issuance or whether SAP deliberately avoided learning about

27       the '923 Patent after its issuance given its familiarity with Teradata's technology
         and its developers from working with Teradata on the Bridge Project, its awareness

28       of Teradata's activities in the EDAW field, specifically targeting the same market

that Teradata serves when developing its own products, and because of the prior litigation between the two parties that is currently pending before this Court (Case No. 3:18-cv-03670-WHO).

(Am. Compl., ¶ 77 (footnote omitted); *see also id*., ¶¶ 24 ('357 patent), 58 ('000 patent).)

These allegations fail to make pre-suit knowledge of infringement and specific intent to infringe plausible for several reasons. *First*, they do not provide any plausible basis for inferring that defendants SAP America, Inc. or SAP Labs, LLC had knowledge of the cited Teradata patents or application. *See ZitoVault, LLC v. Int'l Bus. Machines Corp*., No. 3:16-CV-0962-M, 2018 WL 2971131, at *3 (N.D. Tex. Mar. 29, 2018) (dismissing allegation of pre-suit willful infringement and refusing to impute knowledge of patent by a parent to its subsidiary). *Second*, they provide no factual basis making it plausible that any SAP defendant would scour *all* patents and patent applications cited against a patent application of a subsidiary (Business Objects), or of a predecessor in interest (IBM), or even of SAP SE, to read and assess the claim scope of each such cited patent or application. *Cf. Software Research, Inc. v. Dynatrace LLC*, 316 F. Supp. 3d 1112, 1133–35 (N.D. Cal. July 3, 2018) (dismissing induced and contributory infringement claims based on pre-suit conduct, for insufficient allegations of pre-suit knowledge of the patents, despite a Patent Office Examiner rejecting a patent application of the defendant's predecessor as being unpatentable over, *inter alia*, a published parent application of some of the asserted patents). For example, the Amended Complaint does not allege that Teradata itself does this, even with its comparable knowledge of and dealings with SAP. *Third*, they provide no factual basis to infer that these three citations identified in the Amended Complaint somehow stood out from the mountains of citations of prior art in patent applications of the SAP defendants, their subsidiaries, and their predecessors, such that it is reasonable to infer that the SAP defendants would treat them specially, read them, and assess their claim scope. There is no allegation that these patents were even identified as Teradata patents when cited as prior art in the Patent Office. *Fourth*, there is no allegation making it plausible that anyone associated with the accused HANA product knew of these patents, or read their claims, or compared them to the accused product. *Fifth*, Teradata's assertion that the *application* for the '923 patent was cited during the prosecution of a SAP patent (Am. Compl., ¶ 77) does not allege sufficient knowledge additionally because it was not the issued

patent. *See McRee v. Goldman*, No. 11–cv–00991, 2012 WL 3745190, at *3 (N.D. Cal. Aug. 28, 2012) ("[M]ere knowledge of a pending patent application . . . does not give rise to liability for inducement."). *Sixth*, the Amended Complaint does not assert that Teradata marked any Teradata product with the number of any asserted patent.

At this stage, Teradata need not, of course, prove that SAP *probably* knew its customers were infringing the asserted patents. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Nevertheless, in order to properly bring an indirect infringement claim, a plaintiff must plead non-conclusory facts raising a reasonable inference that the defendant knew that it was causing its customers to infringe. *See Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1363–64 (Fed. Cir. 2017) (affirming district court's dismissal of indirect infringement claims and rejecting plaintiff's assertion that pleadings created a reasonable inference of the requisite knowledge for indirect infringement); *Superior Indus.*, 700 F.3d at 1295–96 (affirming dismissal of indirect infringement claims and holding pleadings were deficient for, *inter alia*, failing to "allege any facts to support a reasonable inference that [defendant] specifically intended to induce infringement of the [patent] or that it knew it had induced acts that constitute infringement"); *Aftechmobile Inc. v. Salesforce.com, Inc.*, No. 19-CV-05903-JST, 2020 WL 6129139, at *11 (N.D. Cal. Sept. 2, 2020) ("[C]onclusory allegations do not raise the reasonable inference that Salesforce knowingly induced [infringement], . . . intended others to infringe . . . [and] knew that the acts of others constituted infringement."), *appeal filed*, 2020 WL 6129139 (Fed. Cir. Oct. 26, 2020); *Grobler v. Sony Comput. Entm't Am. LLC*, 5:12-CV-01526-LHK, 2013 WL 308937, at *3 (N.D. Cal. Jan. 25, 2013) ("A bare allegation that [defendant] knew of the patent and knew or should have known its activities in encouraging and assisting customers in the use of the [accused product] . . . would induce its customers' direct infringement . . . does not contain any factual allegations that could plausibly support an inference of intent.").

In *Cleveland Clinic*, the Federal Circuit held dismissal was appropriate where the amended complaint contained no allegations plausibly "showing 'specific intent and action' on behalf of [the defendant] to induce infringement of the [patent]" by third-parties and noted that even "mere

knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement" are required to state a claim for indirect infringement. 859 F.3d at 1364 (citing *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (en banc)). The deficiencies in Teradata's pleadings make an even stronger case for dismissal where Teradata fails to allege non-conclusory facts demonstrating any pre-suit knowledge of infringement and concludes, e.g., that SAP "is currently actively inducing and encouraging infringement" or "contribut[ing] to infringement of the [asserted patents] by offering to sell or selling within the United States or importing into the United States" accused products which products are used in accord with manuals SAP provides. (Am. Compl., ¶¶ 28–29, 59–60, 67–68, 81–82, 95–96.) Providing manuals does not support a reasonable inference of knowing, intentional infringement.

Furthermore, Teradata states in its Amended Complaint that SAP "became aware of" the '419 and '623 patents "no later than the date of Teradata's transmittal of the Complaint to SAP on August 31, 2020." (*Id.*, ¶¶ 63, 91.) Thus, the Amended Complaint fails to allege any pre-suit knowledge of these patents, let alone knowledge of infringement or the specific intent and action to induce infringement. To equate receipt of a complaint asserting infringement with past knowledge of infringement would make the knowledge-of-infringement requirement a dead letter. Therefore, at a minimum the Court should rule that the Amended Complaint fails to state a claim for pre-suit indirect infringement.

As for post-suit indirect infringement, this Court and some others have held that a complaint itself may provide the knowledge and specific intent elements for prospective indirect infringement, while other courts have disagreed. *Compare Illumina, Inc. v. BGI Genomics Co.*, No. 19-cv-03770-WHO, 2020 WL 571030, at *7 (N.D. Cal. Feb. 5, 2020) (and cases cited therein) *with Dynamic Data Techs., LLC v. Brightcove Inc.*, No. 19-1190-CFC, 2020 WL 4192613, at *3 (D. Del. July 21, 2020) (finding "the complaint itself cannot be the source of the knowledge required to sustain claims of induced infringement") and *Kaufman v. Microsoft Corp.,* No. 16 Civ. 2880 (AKH), 2020 WL 364136, at *4 (S.D.N.Y. Jan. 22, 2020) (holding that "Plaintiffs theory [of post-suit knowledge of the asserted patent] is without merit" and "not the law in this district").

SAP requests the Court reconsider its position. *First*, alleged knowledge and intent arising from receipt of a complaint necessarily occurs after a complaint is filed. As a matter of general federal civil procedure, a complaint speaks to past not future acts constituting a cause of action. Under Fed. R. Civ. P. 15(d), if a plaintiff's claim depends on "any transaction, occurrence, or event that happened after the date of the" complaint, then it should move for leave to supplement the complaint. Patent cases are not exempt from this rule. *Second*, any assertion of another's future knowledge and intent is inherently "conclusory" under *Iqbal*. Given that not all patent infringement is intentional, any allegation that a future infringement *will be* intentional is a conclusion based on speculation not an allegation of fact. *Third*, "requiring a Plaintiff to plead knowledge based on facts other than the filing of the present lawsuit furthers judicial economy and preserves parties' resources by encouraging resolution prior to filing a lawsuit." *Proxyconn Inc. v. Microsoft Corp.*, No. SACV 11-1681 DOC ANX, 2012 WL 1835680, at *5 (C.D. Cal. May 16, 2012). For at least these reasons the Court should rule that the Amended Complaint fails to state a claim for indirect infringement prospectively, as well as pre-suit.

## III.   <u>CONCLUSION</u>

This motion should be granted without leave to again amend the Complaint. With SAP's motion to dismiss in hand, Teradata amended its complaint and that amendment does not cure the shortcomings explained herein. There is no good cause to grant leave for Teradata to amend again.

Dated: November 18, 2020                    Respectfully submitted,

                                            KLARQUIST SPARKMAN, LLP

                                            By:   */s/John D. Vandenberg*
                                                  John D. Vandenberg

                                            Counsel for Defendants
                                            *SAP SE, SAP AMERICA, INC., and SAP LABS, LLC*