1   Tharan Gregory Lanier (SBN 138784)
    tglanier@JonesDay.com
2   Nathaniel P. Garrett (SBN 248211)
    ngarrett@JonesDay.com
3   JONES DAY
    555 California Street, 26th Floor
4   San Francisco, CA 94104
    Telephone:   +1.415.626.3939
5   Facsimile:   +1.415.875.5700

6   Joseph Matthew Beauchamp (*Pro Hac Vice*)
    jbeauchamp@jonesday.com
7   Joshua L. Fuchs (*Pro Hac Vice*)
    jlfuchs@jonesday.com
8   JONES DAY
    717 Texas Street, Suite 3300
9   Houston, TX 77002
    Telephone:   +1.832.239.3939
10  Facsimile:   +1.832.239.3600

11  J. Christopher Carraway (*Pro Hac Vice*)
    chris.carraway@klarquist.com
12  Roy Chamcharas (*Pro Hac Vice*)
    roy.chamcharas@klarquist.com
13  Klaus H. Hamm (State Bar No. 224905)
    klaus.hamm@klarquist.com
14  John D. Vandenberg (*Pro Hac Vice*)
    john.vandenberg@klarquist.com
15  KLARQUIST SPARKMAN, LLP
    121 SW Salmon Street, Suite 1600
16  Portland, OR 97204
    Telephone:   +1.503.595.5300
17  Facsimile:   +1.503.595.5301

18  *Attorneys for Defendants SAP SE,*
19  *SAP AMERICA, INC., and SAP LABS, LLC*

20              UNITED STATES DISTRICT COURT

21            NORTHERN DISTRICT OF CALIFORNIA

22               SAN FRANCISCO DIVISION

23  TERADATA US, INC.,                      Case No. 3:20-cv-06127-WHO

24          Plaintiff,                      **DEFENDANTS' REPLY IN SUPPORT
                                            OF MOTION TO DISMISS AMENDED**
25      v.                                  **COMPLAINT**

    SAP SE, SAP AMERICA, INC., and SAP      Date: January 6, 2021
26  LABS, LLC,                              Time: 2:00 p.m.

27          Defendants.                     **Judge: Honorable William H. Orrick**

28

1

**TABLE OF CONTENTS**

2   I.    THE FOCUS OF EACH ASSERTED CLAIM IS ABSTRACT ........................................1

3   II.   TERADATA CONFLATES THE PROBLEM
        ADDRESSED WITH THE CLAIMED SOLUTION..........................................................4
4
    III.  TERADATA CONFLATES USEFUL INFORMATION
5         WITH AN IMPROVEMENT IN COMPUTER CAPABILITIES .....................................6

6   IV.   NO ADDITIONAL CLAIM ELEMENT SATISFIES STEP TWO ..................................9

7   V.    TERADATA DISREGARDS THE STEP TWO FILTERS..............................................11

8   VI.   THE PATENT OFFICE DECIDED A FUNDAMENTALLY DIFFERENT ISSUE.......12

9   VII.  THERE IS NO MATERIAL FACT
        DISPUTE OR CLAIM CONSTRUCTION DISPUTE ....................................................13
10
    VIII. INDIRECT INFRINGEMENT ........................................................................................13
11
    IX.   CONCLUSION...............................................................................................................14
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
   573 U.S. 208 (2014) ................................................................................................ passim

*BSG Tech LLC v. BuySeasons, Inc.*,
   899 F.3d 1281 (Fed. Cir. 2018) ..................................................................................... 3, 7

*ChargePoint, Inc. v. SemaConnect, Inc.*,
   920 F.3d 759 (Fed. Cir. 2019) ................................................................................. 1, 2, 11

*Commil USA, LLC v. Cisco Sys., Inc.*,
   135 S. Ct. 1920 (2015) ..................................................................................................... 14

*DSU Med. Corp. v. JMS Co.*,
   471 F.3d 1293 (Fed. Cir. 2006) ...................................................................................... 13

*Elec. Power Grp., LLC v. Alstom, S.A.*,
   830 F.3d 1350 (Fed. Cir. 2016) ............................................................................... passim

*Global-Tech Appliances, Inc. v. SEB S.A.*,
   563 U.S. 754 (2011) ......................................................................................................... 13

*HTC Corp. v. IPCom GmbH & Co.*,
   667 F.3d 1270 (Fed. Cir. 2012) ........................................................................................ 5

*In re Fox*,
   471 F.2d 1405 (C.C.P.A. 1973) ........................................................................................ 3

*Ricoh Co. v. Quanta Computer Inc.*,
   550 F.3d 1325 (Fed Cir. 2008) .................................................................................. 13, 14

*SAP Am., Inc. v. InvestPic, LLC*,
   898 F.3d 1161 (Fed. Cir. 2018) ...................................................................................... 12

*Synopsys, Inc. v. Avatar Integrated Sys., Inc.*,
   2020 WL 6684853 (N.D. Cal. Nov. 12, 2020),
   *reconsideration denied*, No. 20 Civ. 04151-WHO (N.D. Cal. Dec. 22, 2020) ................... 7, 12

*Uniloc USA, Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011) ........................................................................................ 9

**Statutes**

35 U.S.C. § 101 ......................................................................................................... 12, 15

35 U.S.C. § 102 .............................................................................................................. 12

35 U.S.C. § 103 .............................................................................................................. 12

# I.       THE FOCUS OF EACH ASSERTED CLAIM IS ABSTRACT

Step One of *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014) requires identifying the focus of the patent's claimed advance over the prior art, based on the claim language and specification. (*See* ECF No. 34 ("Mot.") at 6:22–25.) This requires distinguishing the claimed *solution* from the *problem* addressed by the '000 patent. *See, e.g., ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 767 (Fed. Cir. 2019) ("The 'directed to' inquiry [of *Alice* Step One] may also involve looking to the specification to understand 'the problem facing the inventor' and, ultimately, what the patent describes as the invention." (citation omitted)).

Consider a travel agency that recommends alternative routes for traveling around a city having multiple modes of transportation (buses, subways, sidewalks, etc.). It once provided text-only descriptions but now depicts the proposed routes on a map to allow customers to more easily follow them. The city's crisscrossing buses, subways and streets constitute a technological environment posing an information complexity problem which the agency solves by graphically displaying the information. Albeit in a different technological environment, this is akin to the problem and solution in the asserted U.S. Patent No. 7,185,000 (the "'000 patent"). As this claimed solution is merely the display of selected information, it is a patent-ineligible abstract idea under *Alice*. (*See* Mot. at 9:11–12.)

Claim 1: Teradata does not deny that what SAP identifies as the claimed solution—the graphical[1] display of selected information—is an abstract idea under *Alice*. (*Id*. at 3:8–10.) The only dispute under Step One, therefore, is whether this is the focus of claim 1. On this question, Teradata fails to address the following intrinsic evidence SAP cited to show that this abstract idea indeed *is* the focus of claim 1:

- the claim's preamble: "method of presenting" a query plan;

- the patent's title: "method and apparatus for presenting query plans";

- the patent's technical field: "method and apparatus for presenting query plans";

---

[1] While the claims are unclear whether they require a graphical display (*see* Mot. at 2, n.1), Teradata assumes they do (*see, e.g.*, ECF No. 39 ("Opp.") at 2:17–18) and so will SAP for purposes of this motion.

- the patent's description of the problem: "For complex execution plans, conventional explain text is often difficult to read and understand.";

- the patent's description of its solution: "With the graphical output of the visual explain and compare module, a more user-friendly interface is provided in which query execution plans may be analyzed."; and

- the patent's figures: thirteen figures show graphical displays of query plans.

(*See id.* at 3:4–4:1, 8:15–18.)

All of the above speak to the patent's alleged advance over the prior art—the key to identifying the claim's focus—yet Teradata says not a word about any of it. *Cf. ChargePoint*, 920 F.3d at 767–68 (determining claim's focus by first looking to patent's specification to identify the problem addressed by the inventors and their alleged solution).

This abstract idea of graphically displaying selected information, of course, requires that the information—be it query plans or travel routes—first be determined. (*See* Mot. at 9:18–19.) Claim 1 therefore recites determining a query plan for a query intended to be run in the claim's technical environment (having a parallel database system and virtual processors). This claim step merely gathers the data to be displayed. Nothing in the patent suggests that this data gathering step is the patent's alleged advance or the claim's focus. The patent does not say, for example, that existing query "optimizer" programs were unable to determine this information. Quite the contrary. The patent's Background explains that optimizer programs had been determining complex query plans for "many" "multi-node parallel processing systems," creating an information complexity problem for database administrators trying to analyze textual descriptions of those plans. ('000 patent at 1:11–45.) The amended complaint makes this same point. Consistent with the patent's Background, it alleges that before the alleged invention, database queries were already being run on parallel databases having virtual processors, presenting the information complexity problem addressed by the patent: "The '000 Patent arose from a new appreciation of how to enable database administrators to *better* analyze problems resulting from the distribution of query execution across multiple parallel virtual processors . . . [.]" (ECF No. 32 ("Am. Compl."), ¶ 48 (emphasis added).) "Better analyze" means they already had been analyzing such

1    queries, but with difficulty. Thus, the amended complaint and patent are consistent: the technology

2    of parallel database systems with virtual processors (the buses, trains and sidewalks) were not the

3    problem and neither was how to determine query plans (travel routes) for such environments. The

4    problem instead was the informational complexity of those plans.

5         Teradata says that virtual processors were an "improvement in computer capabilities."

6    (Opp. at 6:10–13; *see also id.* at 3:28–4:1, 5:18–21, 9:23–27, 10:10–17, 15:11–12.) One day that

7    surely was true, perhaps when Teradata obtained a patent on them in 1994 (*see* Am. Compl., ¶ 16).

8    But that is irrelevant here, because *this* patent filed in 2000 does not assert virtual processors as its

9    supposed innovation. Instead, the patent's skeletal discussion of virtual processors befits a well-

10   known technical environment, not an allegedly novel innovation contributed by the patent. *Cf.*

11   *BSG Tech LLC v. BuySeasons, Inc.*, 899 F.3d 1281, 1289 (Fed. Cir. 2018) (that the specification

12   "says nothing about how to construct a database structure that is not modified by the addition of

13   new parameters . . . suggests that this feature of the claimed system is not [the claim's] focus").

14   The specification's only discussion of virtual processors is in relation to Fig. 2's example of a

15   "target system" environment where the query is intended to run. The patent treats the virtual

16   processors in this target system as nothing new, like buses or trains in a city. For example, Fig. 2

17   depicts each virtual processor as a black box (labelled "VPROCS") without any internal

18   components or operations depicted. These black boxes are the only appearance of virtual

19   processors in the patent's figures. The specification gives two examples of a virtual processor:

20   "parsing engines (PEs) and virtual access module processors (VAMPs)," without explaining either

21   example. ('000 patent at 5:61–63.) Under *In re Fox*, 471 F.2d 1405 (C.C.P.A. 1973), precedent

22   SAP cited and that Teradata disregards, this lack of explanation indicates that the patent applicants

23   assumed skilled artisans were already familiar with parsing engines and VAMPs, and thus, virtual

24   processors as well. (*See* Mot. at 17:11–13.) Teradata does not argue that the applicants were

25   mistaken. As noted above, the amended complaint confirms that queries were already being run

26   on parallel databases with virtual processors. *See supra* at 2:22–28.

27        In sum, reviewing the claim as a whole in the context of the specification demonstrates that

28   the patent's alleged advance over the prior art, and claim 1's focus, is the graphical display of

selected information, not the gathering of that information, nor the technical environment causing that information to be complex, and it is undisputed that this graphical display is an abstract idea.

Claims 19–25: These claims merely narrow the content and/or source of the information that is graphically displayed. They add to claim 1's abstract idea the further abstract idea that the displayed query plan is based on data about a customer's target environment (e.g., as simple as the number of processors)—akin to the travel agency customizing routes based on the customer's capabilities or preferences. Teradata confirms that this target-emulation aspect of these claims is part of their focus, calling it the "central innovative feature" of claims 19–25. (Opp. at 7:22–24; *see also id*. at 7:5–7 (information about the target (customer) system is used "in order to more accurately analyze" queries).) As a matter of law, merely limiting the content and/or source of the information to be displayed does not remove its display from the realm of abstract ideas. *See Elec. Power Grp., LLC v. Alstom, S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016) (limiting information "to particular content . . . does not change its character as information").

## II.   TERADATA CONFLATES THE PROBLEM <u>ADDRESSED WITH THE CLAIMED SOLUTION</u>

As noted, Teradata does not deny that graphically displaying selected information to allow database administrators to more easily understand it, is a patent-ineligible abstract idea under *Alice* Step One. Instead, Teradata attempts to divert attention away from this claimed solution and onto the technical environment that causes the information complexity problem purportedly solved by this solution. As noted, *Alice* Step One often requires identifying the problem described in the patent so as to help identify the alleged solution to that problem, and hence, the focus of the claims. Teradata, however, attempts to conflate the problem with the solution.

Like any other invention, an invention claimed in a patent is not a problem or a cause of a problem but rather a (purported) solution to a problem. Here, the nature of the problem addressed by this patent's alleged innovation is clear from the patent, the amended complaint, and even the opposition brief. Specifically, there was an existing information complexity problem arising from an existing technological environment. The "[p]atent aims to solve a problem specific to query execution plans running on massively parallel databases having multiple virtual processors." (Opp.

at 3:26–27.) The problem was the difficulty database administrators were having trying to analyze query plans for queries to be run in technical environments having "parallel databases with virtual processors." (*Id*. at 4:13–14.). "The '000 Patent arose from a new appreciation of how to enable database administrators to *better* analyze problems resulting from the distribution of query execution across multiple parallel virtual processors . . . [.]" (*Id*. at 4:9–11 (quoting Am. Compl., ¶ 48) (emphasis added).) This is the problem identified in the Background section of the patent: (1) "For complex execution plans, conventional explain text is often difficult to read and understand" ('000 patent at 9:34–36) and (2) the displayed execution plans are particularly complex when the query will run in a "massively parallel processing" environment (*id*. at 1:29–39). This difficulty database administrators had understanding these complex query plans is not "a computer problem" (Opp. at 6:2) or a "computer technology problem" (*id*. at 7:25–26). It is an information complexity problem.

The patent proposes and claims a solution to this information complexity problem. The solution is *not* the use of parallel database systems with virtual processors. That was the existing technical environment that caused the information complexity problem. Instead, the proposed solution is to display the query plans graphically. *See supra* at 1:18–19. The amended complaint says as much: "It was a valuable innovation for query problem-solving to display concurrent elements of the execution plan on multiple processors as they run a single query in parallel, each node responsible for different data sets that may present different challenges." (Am. Compl., ¶ 48.)

In service of conflating the patent's information complexity problem with its proposed solution, Teradata also conflates each claim's *elements* (claiming the solution) with its *environment* (causing the information complexity problem). Patent claims often recite not only the elements of the claimed method or apparatus but also the environment in which that method or apparatus operates. *See HTC Corp. v. IPCom GmbH & Co.*, 667 F.3d 1270, 1274 (Fed. Cir. 2012) (holding that alleged method steps in an apparatus patent claim "merely describe the network environment in which the mobile station must be used"). Sometimes, as here and in the travel agency example, that technical environment is the source of an information complexity problem the patent purports to solve. In *Elec. Power Grp.*, for example, the claimed method recited

"detecting events on an interconnected electric power grid in real time," including "receiving a plurality of data streams, each of the data streams comprising sub-second, time stamped synchronized phasor measurements." 830 F.3d at 1351. Electric power grids and sensors for making phasor measurements undoubtedly are patent eligible. But those physical-realm components were merely the technical environment for the claimed method, from which data was gathered for analysis and display. As here, these components of the technological environment also were the cause of the information complexity problem faced by those responsible for administering such equipment. The claimed method solved this information complexity problem not by improving the technology of the technical environment but by analyzing the information and displaying those analyses in human-manageable form. *See id.* at 1355. Here, too, the claims recite not only the display and depict elements of the claimed alleged invention (solution) but also its technological environment (parallel database with virtual processors), which causes the information complexity problem addressed by the claimed invention.

Even more fundamentally, the central problem with the opposition is that it disregards the actual claims. It disregards, in particular, that the parallel database system and virtual processors are not an element of the alleged invention of any asserted claim. Method claim 1 does not require that any of its claim steps be performed by the parallel database target system or the virtual processors. On the contrary, non-asserted dependent claim 2 makes it clear that the method of claim 1 may be (and is, in claim 2) performed by a "test system" that is distinct from that "target system." System claim 19 likewise does not require the claimed system to have a parallel database. Rather, the parallel database is recited as being part of a "target system" that is different than the claimed system. Article claim 25 likewise does not require the article to be part of a parallel database system.

## III.   TERADATA CONFLATES USEFUL INFORMATION WITH AN IMPROVEMENT IN COMPUTER CAPABILITIES

Post-*Alice*, patent owners addressing Step One routinely attempt, without success, to conflate the inherent utility of better information or information processing, with an improvement making a computer perform its basic operations in a better way. (*See* Mot. at 11:25–12:15.)

Teradata attempts just this. It conflates what the patent asserts makes database administrators better at analyzing information (*viz*., graphical display of the information) with an actual improvement making a computer perform its operations in a better way. (*See* Opp. at 2:13–15.) For example, after describing the alleged benefits inherent in displaying query plans graphically—such as allowing the database administrator to "diagnose" a problem with the plan—Teradata labels this "improved computer functionality." (*Id*. at 7:22–24.) But Teradata's label is misplaced. The alleged utility is inherent in the abstract idea itself: graphically displaying a complex query plan with or without basing that query plan on information about the customer's environment. "Merely requiring the selection and manipulation of information — to provide a 'humanly comprehensible' amount of information useful for users . . . by itself does not transform the otherwise-abstract processes of information collection and analysis." *Elec. Power Grp.*, 830 F.3d at 1355 (citation omitted).

Similarly, Teradata argues that using data about a customer's environment rather than the environment of the database vendor, is a technological improvement. (Opp. at 6:16–18.) It is not. It does not change how a query plan is determined. It merely changes the source and content of the data input for that conventional process. *Cf. BSG Tech LLC,* 899 F.3d at 1288 (Fed. Cir. 2018) ("[A]n improvement to the information stored by a database is not equivalent to an improvement in the database's functionality."); *Synopsys, Inc. v. Avatar Integrated Sys., Inc*., No. 20-CV-04151-WHO, 2020 WL 6684853, at *8 (N.D. Cal. Nov. 12, 2020) (hereinafter, "Avatar") ("This is an improvement to the quality and accuracy of the data used as part of the chip design process — not an improvement to any system."), *reconsideration denied*, No. 20 Civ. 04151-WHO (N.D. Cal. Dec. 22, 2020).

Teradata stretches "improving computer technology" beyond the breaking point. Teradata suggests that not burdening a device is tantamount to improving the device. (Opp. at 6:16–18.) This is what it means when it touts "improved computer functionality resulting from the use of emulation data to diagnose the complex problems caused by multiple processors operating in parallel." (*Id*. at 7:22–24.) Rather than have the customer's database administrator try to figure out a textually displayed query plan for a query intended for the customer's database, the database

vendor diagnoses a graphically displayed query plan based on information about the customer's database environment. Of course, this is useful, but it does not improve technology. Under Teradata's theory, talking mask-to-mask to a neighbor, thereby unburdening each neighbor's phone, would improve phone technology.

No claim requires improving any query, query plan, processor, or software for determining a query plan. No claim requires running a query on a database. No claim requires anything to speed or improve the operation of any database or computer. Instead, the claims stop at *displaying* a query *plan* that might or might not ever be used, to allow a user to analyze that plan. Again, this is similar to *Elec. Power Grp.*, where the claim stopped at displaying analyses, without claiming any subsequent improvement to the equipment or its operation.

To try to shoehorn these claims into selected "improved technology" precedents concerning improved computer memory, user interface, or security technology (Opp. at 5:4–14, 8:4–25), Teradata badly misstates the claims, repeatedly. It says, for example, that "the invention in claim 1 allows a computer 'to do things it could not do before,' *id*.: to analyze and troubleshoot query execution plans and respond quickly and efficiently . . . [.]" (*Id*. at 5:14–16.) If the claims said that (and if the patent described that), then SAP would not have filed this motion. But Teradata is mistaken. Graphically displaying a query plan to a database administrator does not allow the *computer* to do anything. The graphical display allows a *person* to do something better: to analyze the query plan better. The patent says so ('000 patent at 1:22–28 (describing conventional "mechanism for a user to view the execution plan"), 9:32–42 ("more user-friendly")), as does the amended complaint (Am. Compl., ¶ 41 (noting the need for "database administrators" to analyze query problems "efficiently")). Unlike the precedents cited by Teradata in which the claimed inventions allowed a computer to do things better, the claims here allow a user to understand information better as in precedents cited by SAP. Under *Alice*, that distinction makes all the difference. (*See* Mot. at 2:3–9, 6:27–7:14, 9:5–15, 10:13–12:22.)

Similarly, Teradata says that the claims "describe an inventive way to perform database query functions on a parallel database having virtual processors that improves the speed and efficiency of the database." (Opp. at 9:20–22; *see also id*. at 2:18–19 ("the database query is

running on each parallel node of a database system with virtual processors"), 10:23–11:1, 13:9–12.) The claims say nothing of the kind. They no more require performing a query on the parallel database than a travel agent's route recommendation requires the customer to actually ride a train. Rather, they require displaying a *plan* for doing that. And, displaying the plan does not change the database or make it faster or more efficient.

Again, Teradata proclaims: "[Claim 1] recites a particular improvement in the means by which queries can retrieve answers . . . [.]" (*Id*. at 5:18–19.) Wrong again. Claim 1 neither poses a query to a database nor retrieves an answer from a database and certainly does not recite improvements to those non-recited operations.

Teradata points to the claim language "concurrently executing plural steps on respective processors of the parallel database system," but this language merely modifies the content of the displayed query *plan* ("displaying plural elements corresponding to concurrently executing …") similar to a travel route showing parallel bus and train lines. (*See* '000 patent at 12:66–13:2.)

In sum, the claim the opposition brief posits and defends might have been patent-eligible but it is nothing like the actual '000 patent claims Teradata asserts in this lawsuit.

## IV.   NO ADDITIONAL CLAIM ELEMENT SATISFIES STEP TWO

To save claims like these, *Alice* Step Two looks for some novel physical-realm structures or acts for performing the abstract idea identified in Step One. But, here, Teradata identifies nothing like that. It is undisputed that the patent neither claims nor discloses any particular acts or structures to display plans graphically but instead presents its "visual explain and compare" module as a black box. (Mot. at 4:5–8.) The claims therefore are invalid because they recite a generic method for graphically displaying specific information in a specific technical environment.

Claim 1: No additional claim element—i.e., an element in addition to the abstract idea—saves claim 1 under Step Two. (*See id*. at 14:24–25, 15:22–23.)

The recited parallel database system and virtual processors surely are in the physical realm but they are merely the *environment* in which the query (whose query plan is displayed) is intended to be run, akin to the trains, buses and sidewalks. *Cf. Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1309 (Fed. Cir. 2011) (holding that a patent claim "focuses exclusively on" a remote

station but also "defines the environment in which that … station must function," including a local station having certain recited functionality). The claim does not require the processors or database of that environment to perform any step of the claimed method (displaying, depicting and determining a query plan) any more than the buses, trains and sidewalks determine or display proposed travel routes. Instead, some unidentified thing gathers and displays data (a query plan) that is based in part on *information about* that environment. Thus, the claim's technical environment affects the content of the information that is displayed, just as the trains and buses affect the content of the proposed routes displayed, and nothing more. As a matter of law, this fails Step Two. *Cf. Elec. Power Grp.*, 830 F.3d at 1355 ("[A] large portion of the lengthy claims is devoted to enumerating types of information and information sources available within the power-grid environment. But merely selecting information, by content or source, for collection, analysis, and display does nothing significant to differentiate a process from ordinary mental processes, whose implicit exclusion from § 101 undergirds the information-based category of abstract ideas.").

Indeed, Teradata makes precisely this point about the limited role of the processors and database in the claims, perhaps inadvertently. It explains that the method of claim 1 "present[s] *specifically required content*—'plural elements *corresponding to* concurrently executing plural steps on respective processors of the parallel database system.'" (Opp. at 13:15–18 (emphases added).) In other words, the role of the processors and parallel database system in this claim is merely as the technical environment affecting the *specific content* of the information that is graphically displayed. This is insufficient under Step Two. (*See* Mot. at 15:22–28.)

Similarly, the claim's "determining" step merely gathers information for the claimed method to present it graphically, disqualifying it under Step Two. (*See id*. at 16:11–12.) As noted, this "determining" step also is dictated by the claim's abstract idea and is abstract in its own right—two more disqualifiers under Step Two. (*See id*. at 16:9–10.) And, it is purely functional—yet another disqualifier. (*See id*. at 16:10–11.) This "determining" data gathering step does not specify *how* the query plan is determined. It does not, for instance, require that the query plan be

determined in some new way different than the known ways the patent's Background and amended complaint reference. *See supra* at 2:19–3:3.

Claims 19–25: For the same reasons, nothing in claims 19–25 qualifies under Step Two. The recited "target system" is not part of the claimed "system" of claim 19 or the claimed "article" of claim 25. The target system is merely part of the claim's technical environment—merely affecting the content and/or source of the information to be displayed graphically—and thus cannot qualify under Step Two. (*See* Mot. at 16:20–17:23.)

Claim 19's "controller to determine …" is the generic counterpart to claim 1's "determining" step and, like that step, is both dictated by the claims' abstract idea and also purely functional as it does not recite how the controller performs its recited function. Discussing claim 25's controller, Teradata points to a 'data object extractor' in the *specification* (Opp. at 14:13–15) but identifies nothing in the physical realm required by the claim's reference to a "controller" that is supposedly innovative, non-functional, and not dictated by the abstract idea itself. Again, to implement the abstract idea of graphically displaying selected information based on information about the customer's environment, *something* is needed to first determine that selected information based on the customer's environment. Teradata identifies nothing required by this data-gathering "controller to determine" claim element more specific than that. Indeed, Teradata's infringement allegation in the amended complaint for this claim element refers only to "processors" able to perform certain functions, nothing more specific. (Am. Compl., ¶¶ 56–57.) *See ChargePoint*, 920 F.3d at 769 ("Even a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims, thus preempting all use of that law or idea.").

## V.    TERADATA DISREGARDS THE STEP TWO FILTERS

SAP's motion identifies multiple filters applicable to Step Two, citing governing precedent for each. (Mot. at 13:17–14:23.) Mere data gathering does not satisfy Step Two. A claim's technological environment does not satisfy Step Two. Functions unaccompanied by particular structures or acts for performing the function, do not satisfy Step Two. A claim's abstract idea cannot satisfy Step Two. Teradata disputes none of these precedents yet Teradata disregards each

filter. It points to various claim language as supposedly satisfying Step Two without first attempting to rebut SAP's explanations (*id*. at 14:24–18:16) that this claim language is disqualified under one or more of those established filters. Thus, the opposition fails as a matter of law under Step Two.

## VI.   THE PATENT OFFICE DECIDED A FUNDAMENTALLY DIFFERENT ISSUE

As the patent issued seven years before *Alice*, the Patent Office could not and did not examine these patents under *Alice*. Further, contrary to Teradata's argument (Opp. at 4:18–26, 7:14–18, 11:13–25), nothing said by the Patent Office Board saves these claims under *Alice*. All of the thousands of issued patent claims invalidated under *Alice* were, of course, allowed by the Patent Office as being novel and non-obvious over prior art. But that is irrelevant because the anticipation and obviousness analyses under sections 102 and 103 differ from the analysis under section 101. *See SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1163 (Fed. Cir. 2018) ("Nor is it enough for subject-matter eligibility that claimed techniques be novel and nonobvious in light of prior art, passing muster under 35 U.S.C. §§ 102 and 103."). Under sections 102 and 103, the abstract idea may provide or contribute to the novelty and non-obviousness of the claimed subject matter, but any innovation in the abstract idea is irrelevant under *Alice*. (*See* Mot. at 7:20–27.) Here, even if the particular information selected for graphical display was never so selected before in the claim-recited technical environment, that is irrelevant under *Alice*. (*Id*.) *See also Avatar*, 2020 WL 6684853, at *6 ("[B]eing narrowed or cabined to a particular industry or process does not make an abstract concept concrete.").

Also, thanks to Teradata, the Patent Office did not have the record now before the Court on this motion. The Patent Office Board decision found that the prior art before it "had not disclosed doing what claim 1 claims using virtual processors." (Am. Compl., ¶ 50.) But here, Teradata's amended complaint touts that Teradata had long specialized in massively parallel database systems and had a patent on virtual processors in 1994 (*id*., ¶ 16)—a patent that the face of the '000 patent indicates Teradata chose not to disclose to the Patent Office. Further, as previously noted, the amended complaint alleges that before the alleged invention, database queries were already being run on parallel databases having virtual processors: "The '000 Patent

arose from a new appreciation of how to enable database administrators to *better* analyze problems resulting from the distribution of query execution across multiple parallel virtual processors . . . [.]" (*Id.*, ¶ 48 (emphasis added).) In any event, new or not, the claims' technological environment cannot save them from invalidity under *Alice*. (*See* Mot. at 13:17–18.)

## VII.   THERE IS NO MATERIAL FACT DISPUTE OR CLAIM CONSTRUCTION DISPUTE

Teradata identifies no alleged dispute of material fact or claim construction barring this motion. For purposes of this motion, SAP accepts all facts and any claim constructions alleged in the amended complaint.

## VIII.   INDIRECT INFRINGEMENT

Teradata's allegations of indirect infringement may have sufficed under the old "should have known" standard but that is no longer the law.

Teradata cites the 2008 opinion *Ricoh Co. v. Quanta Computer Inc.*, 550 F.3d 1325 (Fed Cir. 2008), for its holding: "[S]pecific intent may be inferred from circumstantial evidence where a defendant has both knowledge of the patent and specific intent to cause the acts constituting infringement." (Opp. at 20:20–23.) That suggests that so long as the defendant knew about the patent, intended to cause the customers' actions at issue, and those actions later are held to infringe, that is enough to show knowledge of infringement. This might make sense if knowledge of infringement encompassed mere negligence, i.e., that the defendant *should have known* the actions it induced infringed the patent. Indeed, *Ricoh* quoted with approval the Federal Circuit's then relaxed requirement that the defendant "knew *or should have known* his actions would induce actual infringements." *Id.* at 1342 (citing *DSU Med. Corp. v. JMS Co.,* 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc as to Section III.B) (emphasis added).)

But "should have known" is no longer the law. The Supreme Court implicitly rejected that standard in 2011, *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 763–64, 765–66 (2011) (addressing both contributory and inducement infringement and holding an accused infringer must know of the patent for both forms of indirect infringement and impliedly requiring that "a violator must *know*" something is "both patented *and infringing*" (emphases added)), and in 2015

confirmed its rejection, *Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1928 (2015) (expressly rejecting a scenario "both in inducement and contributory infringement cases, that a person, or entity, could be liable even though he *did not know* the acts were infringing" (emphasis added)). In *Commil*, the Supreme Court agreed with the part of the Federal Circuit's ruling vacating a judgment of indirect infringement in part because the jury was given the "knew or should have known" instruction, citing *Global-Tech* as having overruled that standard. *See id*. at 1925. Thus, the Court should decline Teradata's invitation to look to *Ricoh* for the law of indirect infringement.

Teradata points to nothing in the amended complaint making it more than merely possible that any SAP defendant knew pre-suit that the actions of its customers infringed any of the asserted patents. It does not allege that Teradata marked any products with the number of any asserted patent or otherwise made known to the defendants pre-suit its position about the alleged scope or infringement of the patents, or that the defendants copied any product practicing the allegedly patented inventions, or that SAP made any pre-suit statements about the scope of any asserted patent claim, for example. Instead, relying on *Ricoh*, it argues that SAP provided information to its customers to help them use the allegedly infringing SAP products, which is true of most any company.

Teradata also argues that the amended complaint shows that the defendants "may have been willfully blind" to infringement. (Opp. at 19:2–3, 19:12.) Even if the amended complaint showed that, which it does not, *Iqbal* requires more. Mere possibilities are not enough. (*See* Mot. at 21:1–11.)

## IX.    <u>CONCLUSION</u>

Perhaps some Teradata patent in the 1990s purported to describe and claim a patent-eligible improvement in parallel database systems, virtual processors, or query optimizer programs determining plans for executing a query in such a database. But the '000 patent is not that patent. From its title to its claims, the '000 patent indicates that the problem it addresses is the complexity of such query plans and its solution is to display those plans graphically to allow a database administrator to more easily analyze them, either for the administrator's own company or a customer. It is both clear under precedents and also undisputed that this graphical display solution

1    is an abstract idea. The Court, therefore, should grant this motion to dismiss under 35 U.S.C. §

2    101.

3

4    December 23, 2020                          Respectfully submitted,

5

6                                               KLARQUIST SPARKMAN, LLP

7                                               By: /s/John D. Vandenberg
                                                    John D. Vandenberg
8
                                                Counsel for Defendants *SAP SE,*
9                                               *SAP AMERICA, INC., and SAP LABS, LLC*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28